UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| CARRIE SLONE, Administratrix of the Estate of Tuanya Lee Slone, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 5: 15-327-DCR |
| V. | ) ) | |
| LINCOLN COUNTY, KENTUCKY, et al., | ) ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Approximately seven hours after being booked into the Lincoln County Jail, inmate Tuanya Slone hanged herself in an isolation cell and died. The administratix of Slone's estate filed this action alleging that Lincoln County, the Lincoln County Jailer, and several deputy jailers were deliberately indifferent to Slone's risk of suicide. The plaintiff also contends that the defendants were negligent and grossly negligent under state law and that Slone's estate is entitled to damages under Kentucky's wrongful death statute.

On December 16, 2016, the defendants moved for entry of summary judgment in their favor regarding all claims asserted in this action. [Record No. 54] For the reasons that follow, the defendants' motion will be granted with respect to all defendants except deputy jailer Renata Patton ("Patton").

## I.    BACKGROUND

Tuanya Slone ("Slone") was arrested on May 15, 2015, for stealing a controlled substance and attempting to escape from the arresting officer. [Record No. 29, p. 4] Patton,

- 1 -

who had been working as a deputy jailer for approximately two months, booked Slone into the Lincoln County Jail around 6:00 p.m. that evening.  [Record No. 63, pp. 8–9]  Patton asked Slone a series of "standard medical questions" during booking and entered Slone's responses into the computerized "Jail Tracker" system.  *Id.*  Slone indicated in response to Patton's questions that she was not contemplating suicide, but had attempted suicide in the past.  *Id.* at p. 12.  Patton noted that Slone had recently ingested potentially dangerous levels of alcohol and that the arresting officer suggested that Slone also had taken an unknown amount of morphine.  *Id.*  Slone's booking apparently coincided with the inmates' evening meal, so she was given a tray of food and a plastic eating utensil known as a "spork."  *Id.* at p. 21.  Slone ate dinner while she answered Patton's questions.  *Id.*

Slone advised Patton that she could not be in a cell with other inmates, although she did not provide a reason.  *Id.* at p. 12.  Patton testified that she strip-searched Slone, but was unable to recall precisely when the search occurred.  *Id.* at p. 15.  At some point during booking, Patton issued Slone a standard jumpsuit and a bedsheet.  Slone remained in the strip-search cell for the rest of the evening.  [Record Nos. 63, p. 19–22; 59, p. 19]

Deputy Jailer Bryan Wilmot was the shift supervisor from 4:00 p.m. until midnight on May 15, 2015.  [Record No. 59, p. 11]  Wilmont was on the second floor handing out medicine to other inmates at the time of Slone's booking.  *Id.* at p. 10.  In keeping with his usual practice of reviewing his subordinates' work during each shift, Wilmot reviewed Patton's work around 10:00 p.m. that night.  *Id.* at pp. 16-17.  He noticed a Jail Tracker "alert" at the time of this review, indicating that, during a previous booking, Slone had reported attempting suicide.  [Record Nos. 59, p. 16; 58, p. 26]  Wilmot immediately notified Patton that she had missed the

alert and that Slone should not have been dressed in a jumpsuit and placed in a cell.  [Record No. 59, p. 16]

Section VII-800 of the jail's Policy Manual provides that inmates who have attempted suicide will be referred to local mental health programs.  [*See* Record No. 54–1, p. 16; *see also* K.R.S. § 441.048.]  Although not expressly addressed in the manual, when a suicide alert is present during intake, the individual being booked waits in the booking area under constant supervision while the deputy contacts Comp Care, the jail's "telephonic behavioral health triage system," K.R.S. § 210.365, to receive further instructions.  [Record No. 59, p. 56]  Comp Care advises the deputy regarding the inmate's level of behavior health risk.  *Id.* at p. 58.  While the jail is not required to adopt Comp Care's recommendation, Defendant Wilmot's testimony suggests that the jail ordinarily does adopt the recommendation and implements Comp Care's recommended protocol for housing and supervising the subject inmate.  *Id.*

Inmates evaluated by Comp Care are classified based on four levels of risk:  low, moderate, high, and critical.  High-risk inmates are placed in an isolation cell and all of their personal property and clothing is removed.  [Record No. 58, p. 30]  Additionally, high-risk inmates are dressed in a suicide-prevention smock known as a "turtle suit," given a suicide-prevention blanket and mat, and observed every 20 minutes.  *Id.*  Inmates placed on critical risk are also dressed in a suicide smock and, if necessary, are placed in a restraining chair.  *Id.* at p. 31.

The jail's Suicide Prevention Policy, Manual Section VIII-600, provides that any inmate who is under observation due to suicidal tendencies shall have items with which the inmate might harm himself or herself removed from the cell.  [*See* Record No. 66–4.]  Before Wilmot discovered that the alert had been missed, Slone had already been given dinner with a

spork, as well as a bedsheet, and had spent several hours alone in her cell. [Record No. 59, p. 19]

Wilmot filled out a "jail triage form" and he and Patton promptly went to Slone's cell and asked her a series of questions. [Record Nos. 59, pp. 20, 29; 58–1, p. 8] According to Wilmot, Slone denied being suicidal at that time or having ever attempted suicide. [Record No. 59, p. 20] When reminded that she had previously admitted attempting suicide, Slone conceded that she had attempted suicide in the past by going out in a hail storm; slitting her wrist in middle school; trying to hang herself seven years ago; and shooting herself in the foot the prior year. [Record No. 58–1, p. 8]

Wilmot contacted Comp Care at 9:50 p.m. for guidance regarding Slone's classification. *Id.* He received a return call from Tia Tenneil ten minutes later. Tenneil advised Wilmot to place Slone on "high risk" for 12 hours and "re-triage" her again at that time. [Record Nos. 59, pp. 21–23; 58–1, p. 8]. Upon her classification as high risk, Slone was permitted only a turtle suit; turtle blanket; turtle mat; and toilet paper in her cell. [Record No. 59, p. 30] Wilmot instructed Patton to "take everything from [Slone]" and "put her in a turtle suit." *Id.* at pp. 27–28. Wilmot did not direct Patton to perform an additional strip-search, but believed that Slone would remove all clothing and that Patton would watch her closely as she changed. *Id.* at p. 28. Wilmot recalled advising Patton that staff would check on Slone every 20 or 30 minutes. *Id.*

Patton claims that she strip-searched Slone when Slone changed from the jumpsuit into the turtle suit, despite not having been instructed to do so. [Record No. 63, p. 17] Patton reported that she used the same technique as during the initial strip search; that is, she watched Slone undress completely before requiring her to squat and cough. *Id.* Patton could not

remember whether Slone was wearing underwear beneath her jumpsuit, whether she was permitted to wear underwear beneath the turtle suit, or whether Slone was menstruating. *Id.* at pp. 18, 26.[1] Patton testified that, after Slone changed into the turtle suit, her cell was cleared of all items except a roll of toilet paper, a turtle blanket, and a turtle mat. *Id.* at p. 20. Patton recalled checking on Slone sometime later and believing her to be "ok." *Id.* at p. 24. By that time, Slone had removed the turtle suit and had wrapped her body with toilet paper. [Record Nos. 63, p. 24; 56, p. 28]

A new staff came on shift at midnight. Wilmot advised the new shift supervisor, Deputy Jailer Brenda Rowland, regarding the situation with Slone. [Record No. 58, pp. 10, 19, 28] Rowland was already familiar with Slone, as she recalled that Slone had been booked into the jail on two previous occasions and, that in August 2014, Slone had been considered at high-risk for suicide. *Id.* at p. 23. Landon Neff, Chrisana Buice, and Jeffery Gooch were the other deputy jailers working that night. *Id.* at p. 19. They received information about the inmates in custody from the outgoing deputies during shift change and from a printed document listing every inmate along with the inmate's location, which the deputies referred to as a "grease board." [Record No. 57, p. 33]

Deputy Jailer Buice was primarily in charge of supervising Slone that night. During head count, which occurred during the shift change at midnight, Buice opened Slone's cell door and asked Slone if she was okay. Slone said "yes," according to Buice. [Record No. 56, p. 9–10] Buice believed Slone to be under the influence of an unknown substance, however, based on "her demeanor and the fact that she had wrapped herself in toilet paper." *Id.* at p. 33.

---

[1] Slone's autopsy report indicates that she was wearing underwear at the time of her death and that she was menstruating. [Record No. 66–7, p. 6]

All further checks on Slone were visual. *Id.* The officers checking on Slone observed her and reported her status to Rowland, which Rowland then recorded in the jail's master log. [Record No. 58, p. 47]

At 12:35 a.m., Sergeant Gooch checked on Slone and observed her to be awake and sitting in the cell's non-working shower area. *Id.* at p. 50. Gooch observed a clear plastic bag on the floor in Slone's cell at that time. [Record No. 57, pp. 14–16] Absent an emergency, Gooch was not permitted to enter a female inmate's cell without a female guard accompanying him. *Id.* at p. 14. Gooch did not believe the situation warranted his entrance into Slone's cell, so he asked Deputy Buice to accompany him to retrieve the bag. However, according to Gooch, this request did not occur until approximately 1:00 a.m. *Id.*

Meanwhile, at 12:48 a.m., Buice checked on Slone again. She was still awake, sitting in the shower area. [Record Nos. 57, pp. 50–51; 56, p. 11] Buice apparently did not see the plastic bag. Gooch's testimony suggests that the bag was in close proximity to the cell door and Buice's height might have prevented her from viewing it from the window. [Record No. 57, p. 47] By 12:48 a.m., Slone had put the turtle suit back on, over top of the toilet paper. [Record No. 56, p. 33] According to Buice, Slone was leaning back against the wall where the remains of a shower head and control handle were located, and Slone was looking at Buice through the window. [Record No. 56, p. 17] At 1:02 a.m., Buice once again observed Slone to be sitting in the shower, awake and in the same position. *Id.* at p. 18.

It appears that, shortly after Buice's cell-check at 1:02 a.m., Gooch and Buice agreed to go back to Slone's cell to remove the plastic bag. At 1:18 a.m., Gooch and Buice arrived at the cell and found Slone unresponsive. [Record No. 56, p. 13] She was still sitting with her back against the shower, but she was cross-legged, leaning forward with a "piece of string"

- 6 -

around her neck.  [Record Nos. 57, p. 30; 56, p. 19]  Gooch rushed into the cell and radioed Captain Rowland to call emergency medical services while Buice ran to the booking area to retrieve scissors.  [Record Nos. 57, p. 32; 56, p. 18]  After cutting the ligature from Slone's neck, Gooch removed her from the shower and laid her on the cell floor.  [Record No. 56, p. 18–19]  Unable to detect Slone's pulse, the deputies began performing CPR.  [Record No. 57, p. 31]  Deputy Jailer Neff heard the call from the third floor where he was performing cell-checks and immediately rushed down to assist with the resuscitation efforts.  [Record No. 62, p. 8–9]  Paramedics transported Slone to the Fort Logan Hospital in Stanford, Kentucky where she was pronounced dead at 2:05 a.m. on May 16, 2015.  [Record Nos. 58–1, pp. 32, 40; 66–1, p. 2]

Kentucky State Police Detective Thornberry arrived at the Lincoln County Jail at 3:52 a.m. on May 16, 2015, and met with Jailer Robert Wilson.  [Record No. 66–1, p. 2]  Thornberry observed a portion of "a rolled up bedsheet around the shower controls" that had been cut to approximately one-half inch in width, and an unknown length.  *Id.* at p. 4.  He located another portion of the cut sheet on a shelf behind the toilet.  There was a knot on one end that contained hair fibers consistent with the color of Slone's hair.  *Id.*  Thornberry unfolded a mat that was in the shower and located a spork with a sharpened handle.  *Id.*

On November 2, 2015, Carrie Slone, Tuanya Slone's sister and the administratrix of her estate, filed suit in this Court, alleging that the defendants were deliberately indifferent to Tuanya's serious medical needs in violation of the Eighth and Fourteenth Amendments to the United States Constitution.  She also asserted claims of negligence, gross negligence, and wrongful death under Kentucky law.  [Record No. 1]  On May 27, 2016, Slone filed an Amended Complaint, naming Lincoln County as a defendant, as well as Jailer Robert Wilson,

and Deputy Jailers Brenda Rowland, Jeffery Gooch, Chrisana Buice, Bryan Wilmot, Renata Patton, Tyler Ryan and Katelyn Griffin, all in their individual capacities. [Record No. 29] The plaintiff voluntarily dismissed her claims against Tyler Ryan and Katelyn Griffin, and the parties' agreed order of dismissal was approved on October 31, 2016. [Record No. 49] All remaining defendants moved for summary judgment following the close of discovery. [Record No. 54]

## II.      STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

Once the moving party has met its burden of production, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Keeneland Ass'n, Inc. v. Earnes*, 830 F.Supp. 974, 984 (E.D. Ky. 1993) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The nonmoving party cannot rely on the assertions in its pleadings; rather, it must come forward with probative evidence to support its claims. *Celotex*, 477 U.S. at 324. In making its determination on the motion for summary judgment, the Court will view all the facts and inferences from those facts in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587.

## III.   ANALYSIS

### A.   Qualified Immunity

The defendants contend that they are shielded from the plaintiff's federal law claims based on the doctrine of qualified immunity.  Generally, a government official performing discretionary functions is entitled to qualified immunity in his individual capacity and is shielded from civil suit if his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Barber v. City of Salem, Ohio*, 953 F.2d 232, 236 (6th Cir. 1992).  *See also Hudson v. Hudson*, 475 F.3d 741, 744 (6th Cir. 2007) (describing scope of "discretionary function" for purpose of § 1983 qualified immunity analysis).  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  The protection provided by qualified immunity covers mere mistakes in judgment, *id.*, and immunizes from suit "all but the plainly incompetent or those who knowingly violate the law."  *Humphrey v. Mabry*, 482 F.3d 841, 847 (6th Cir. 2007) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The defendants maintain that no underlying violation of Slone's constitutional rights occurred and that Jailer Wilson and the deputy jailers are entitled to qualified immunity with respect to the plaintiff's claims of deliberate indifference under 42 U.S.C. § 1983.  [Record No. 54–1, p. 23]  In determining whether qualified immunity applies, the Court must answer two questions: whether the facts as alleged establish that the officer's conduct violated a constitutional right; and whether that right was clearly established at the time of the offense.

*Saucier v. Katz*, 533 U.S. 194, 202 (2001); *Pearson*, 555 U.S. at 231.  Further, the plaintiff must show that the right was clearly established "in light of the specific context of the case, not as a broad general proposition." *Perez v. Oakland Cnty.*, 466 F.3d 416, 427 (6th Cir. 2006). The Court may consider these questions in any order, but if the answer to either question is "no," the defendant is immune from suit. *Pearson*, 555 U.S. at 236.  However, the Court must still construe the facts in a light most favorable to the plaintiff and draw all reasonable inferences in the plaintiff's favor. *Scott v. Harris*, 550 U.S. 372, 377 (2007).

## B.      Deliberate Indifference to a Serious Medical Need

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993).  This includes the government's obligation to provide medical care to those who are incarcerated. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  However, the Eighth Amendment itself does not apply to pretrial detainees such as Tuanya Slone. *See Richko v. Wayne Cnty., Mich.*, 819 F.3d 907, 915 (6th Cir. 2016).  Instead, the Fourteenth Amendment grants analogous rights to adequate medical treatment to pretrial detainees. *Id.* (citing *Roberts v. City of Troy*, 773 F.2d 720, 723 (6th Cir. 1985)).

A plaintiff must prove an objective and subjective component to establish that a prison official was deliberately indifferent to a serious medical need. *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).  The objective component requires the plaintiff to offer facts showing that the medical need at issue is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  A prisoner's "psychological needs may constitute serious medical needs, especially when they result in suicidal tendencies." *Comstock*, 273 F.3d at 702.  *See also Zimmerman v.*

*Burge*, No. 9: 06-cv-176, 2009 WL 3111429, at *7–8 (N.D.N.Y Sept. 24, 2009) (history of suicidal ideation and suicide attempts constitutes "serious medical need").

The subjective component requires the plaintiff to show that the defendants were deliberately indifferent to the inmate's suicidal tendencies. *See Comstock*, 273 F.3d at 703. Specifically, the plaintiff must allege facts which, if true, show that a defendant subjectively perceived facts from which to infer a substantial risk to Slone; that a defendant did in fact draw the inference; and that a defendant disregarded the risk. *See id*. Deliberate indifference requires a degree of culpability greater than negligence, but less than "acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 834. "Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Horn v. Madison Cnty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994).

At the outset, the Court notes that there is no right to be screened correctly for suicidal tendencies. However, once a prisoner has been deemed "suicidal," there is a clearly-established right to continuing medical treatment to address that risk. *Comstock*, 273 F.3d at 702–03. Put differently, the right at issue is "the detainee's right to reasonable protection against taking his own life if that detainee has demonstrated a strong likelihood that he will commit suicide." *Bradley v. City of Ferndale*, 148 F. App'x 499, 506 (6th Cir. 2005). The Court must examine each defendant's conduct individually regarding the plaintiff's § 1983 claims and whether the defendant is entitled to qualified immunity. *See Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 453 (6th Cir. 2008). *See also Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010).

### 1.     Renata Patton

A prison official has an obligation to provide medical care once that official has been alerted to a prisoner's serious medical and/or psychological needs. *Comstock*, 273 F.3d at 702. Although Slone denied suicidal ideation during booking, she told Patton that she had attempted suicide in the past.  [Record No. 63, p. 12]  Patton failed to heed Slone's suicide "alert" on Jail Tracker, which was located at the top of the screen and in red print.  [Record No. 59, 19] Patton explained during her deposition that she "just didn't see it" [Record No. 63, p. 14], but her testimony is contradicted by that of Wilmot, who testified that "you can't miss [the alert]." [Record No. 59, p. 19]

Patton admitted that she was aware of the jail's policy of referring inmates who have attempted suicide to a mental health program, but provided no explanation for failing to follow the procedure when booking Slone.  [Record No. 63, p. 25]  Unlike the Standard Medical Questions from Slone's booking on August 19, 2014, [Record No. 58–1, p. 7], Patton's entry from May 15, 2015, contained no details regarding Slone's previous suicide attempt.  Patton merely checked "yes," to the question whether Slone had ever attempted suicide.  *Id.* at p. 4. Patton may (or may not) have learned that Slone had attempted suicide again within the past year had she asked the appropriate question.  *See id.* at p. 8.

The record further suggests that before Patton "cleared" Slone's cell and required her to change into a turtle suit, Patton had actual knowledge of Slone's four prior suicide attempts and that Slone had been placed on high-risk level.  Patton contends that she strip-searched Slone during initial booking and when Slone changed into a turtle suit and that Slone undressed completely during both searches.  [Record No. 63, p. 15, 18]  The adequacy of these actions is uncertain, since several items of contraband were located in Slone's cell following her death.

- 12 -

[Record No. 63, p. 17]  The defendants have presented the testimony of Dr. Jeffrey Metzner, a psychiatrist, who testified that inmates are able to conceal items even when an appropriate strip search is performed.  [Record No. 64, p. 14]  Conducting an inadequate search cannot be the basis of a deliberate indifference claim when it is premised upon negligence.  However, there is sufficient evidence from which a jury could conclude that Patton acted with deliberate indifference to Slone's risk of suicide, based on Patton's knowledge regarding the previous issuance of the sheet, jumpsuit, and spork, as well as Slone's intoxication.

While the evidence is certainly not conclusive, a reasonable jury could determine that there was a strong likelihood that Slone would attempt suicide and that Patton was aware of that possibility.  *See Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005).  A past suicide attempt does not necessarily mean that there is a strong likelihood of a future suicide attempt. *See e.g., Perez*, 466 F.3d at 435.  However, in this case, the jail's policy required Patton to contact mental health services and supervise Slone continuously until a recommendation was made regarding her classification.  Deputy Wilmot testified that most inmates are given an increased classification if the inmate is "very, very bad intoxicated" when brought in for booking.  [Record No. 59, p. 25]  Accordingly, Slone was on notice that, until a classification was made, an individual reporting a suicide attempt—particularly an intoxicated one—was to be treated as a very high risk inmate.  *See, e.g., Galloway v. Anuszkiewicz*, 518 F. App'x 330, 335–36 (6th Cir. 2013) (factors jury may consider in determining whether inmate demonstrates "strong likelihood" of attempting suicide include whether the inmate requires self-harm observation or is placed on suicide watch).

Reviewing all the facts that were within her knowledge, Patton is not entitled to be shielded by qualified immunity.  A reasonable jury could conclude that Patton violated Slone's clearly-established constitutional right to medical treatment based on her risk of suicide.

### 2.      Bryan Wilmot

Deputy Jailer Wilmot was the shift leader when Slone was brought into the jail on May 15, 2015; however, he was not involved in Slone's booking.  He became aware of Slone's risk of suicide when he reviewed Patton's work at approximately 10:00 p.m.  [Record No. 59, p. 16]  The plaintiff contends that Wilmont was deliberately indifferent toward Slone's risk of suicide in two ways, despite his lack of involvement. [Record No. 66, p. 17]  First, the plaintiff argues that Wilmot failed to direct and supervise Patton adequately, particularly with respect to the search of Slone's cell.  *Id.* at p. 18.  Second, the plaintiff contends that Wilmot was deliberately indifferent for allowing Slone to be housed in a cell that contained the remains of shower fixtures protruding from the wall.  *Id.*

It is well-established that supervisory liability under § 1983 does not attach on the basis of respondeat superior.  Instead, officials are personally liable for their own unconstitutional behavior.  *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989).  Likewise, a claim of failure to supervise or to properly train under § 1983 cannot be based on simple negligence.  *Id.*  Instead, a plaintiff must show that the supervisory official either encouraged or in some way directly participated in the unconstitutional conduct.  *Id.*  "At a minimum, a plaintiff must show that the official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending employee."  *Id.* (quoting *Hays v. Jefferson*, 668 F.2d 869, 872 (6th Cir. 1982)).

- 14 -

The plaintiff has not identified any evidence suggesting that Wilmot encouraged or participated in any unconstitutional conduct with respect to his supervision or direction of Deputy Patton.  If anything, and despite her brief tenure, Wilmot had reason to place trust in Patton, as she had never missed a suicide alert and, according to Wilmot, was "doing good." [Record No. 59, p. 17]  Although Wilmot learned that Patton failed to contact jail triage despite Slone's past suicide attempt, that failure is entirely distinct from Patton's ability to carry out a search and clear a cell of prohibited items.  There is no evidence to suggest that Wilmot "authorized, approved or knowingly acquiesced" in an inadequate search of Slone's person or of her cell.

Wilmot's knowledge of the fixtures in Slone's cell, without more, does not constitute knowledge of a substantial risk of harm to Slone.  Deliberate indifference is "something approaching a total unconcern for [the inmate's] welfare in the face of serious risks, or a conscious, culpable refusal to prevent harm."  *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992).  The plaintiffs have not identified evidence to show that Wilmot subjectively perceived facts from which to infer a substantial risk to Slone; drew the inference; and then disregarded the risk. *See Comstock*, 273 F.3d at 703.  On the contrary, it is undisputed that Wilmot took prompt action to consult with mental health services to determine the appropriate level of risk for Slone.  Wilmot instructed Patton to change Slone into a suicide-prevention smock and remove all potentially dangerous items from her cell.  [Record No. 59, p. 27]

Likewise, the plaintiff has failed to identify any evidence, with regard to the fixtures, which indicates that Wilmot perceived facts from which to infer a risk that Slone might be able to commit suicide.  Stated differently, Wilmot had no reason to suspect that all contraband had not been removed from Patton's cell.  Accordingly, the plaintiff has failed to establish the

subjective component necessary for a claim of deliberate indifference and Defendant Wilmot is entitled to qualified immunity.

### 3.      Chrisana Buice, Jeffery Gooch, and Brenda Rowland

Defendants Rowland, Buice and Gooch arrived at the jail at midnight.  The plaintiff contends that these defendants were deliberately indifferent to Slone's serious medical needs because they allowed her to remain in the strip-search cell where there were fixtures protruding from a wall and where she could not be observed constantly.  As previously explained, however, there is no evidence to suggest that these defendants knew or had reason to know that Slone was likely to have contraband in her cell.  Accordingly, the plaintiff has not shown that these defemdants were aware of a substantial risk that Slone would attempt suicide, and disregarded the risk.  *See Comstock*, 273 F.3d at 703.

The plaintiff appears to rely on Section VIII-600 of the Policy and Procedure Manual, which provides that, "if it is decided that an inmate may be suicidal, the inmate shall be placed in an area where he/she can be constantly observed and communication encouraged."  [Record No. 66–4]  However, the plaintiff has not established that the defendants' conduct was inconsistent with this provision.

Section VIII-600 also indicates that the medical authority shall determine appropriate medical actions and the jailer shall prescribe the appropriate security precautions.  *Id.*  In this case, after contacting jail triage, Deputy Jailer Wilmot adopted Comp Care's suggestion of placing Slone on high-risk level and instituted a supervision schedule of every 20 minutes in compliance with 501 KAR 3:060.  High-risk inmates are housed in the strip-search and booking cells because they are located in the closest proximity to the booking area, where deputies will be able to hear them if they call out.  [Record No, 58, at pp. 40–44]  Further,

Slone's cell door contained a window, which allowed deputies to observe her as frequently as necessary.

The plaintiff criticizes Buice because she did not check on Slone between 12:03 a.m. and 12:48 a.m., despite the directive for checks every 20 minutes. [Record No. 66, p. 19] However, Gooch checked on Slone at 12:35 a.m., so Slone's check was actually overdue by only 12 minutes. Failure to provide 20-minute checks is not *prima facie* evidence of deliberate indifference. *See Bradley v. City of Ferndale*, 148 F. App'x 499, 507 (6th Cir. 2005). Rather, the court must ask whether the defendants subjectively perceived facts from which they could draw an inference that their individual actions would increase the risk of the inmate's suicide, and that they consciously disregarded that risk. *Id.* Such facts are absent here.

Buice testified that Slone was "ok" during headcount at 12:03 a.m. [Record No. 56, p. 9–10] Buice had no reason to suspect that Slone might possess any contraband with which she might harm herself. The fact that Slone had wrapped herself in toilet paper did not alarm Buice because Slone was "noticeably under the influence" and "some [inmates] stand there with nothing on." *Id.* at p. 32–33. Deputy Jailer Katelyn Griffin also observed Slone that night and testified that an inmate removing her turtle suit "wasn't anything new," and that "[s]ometimes they do take them off." [Record No. 60, p. 13]

The plaintiff alleges that both Gooch and Buice acted with deliberate indifference by failing to promptly remove the plastic bag from Slone's cell. According to Gooch, he observed the plastic bag when he checked on Slone at 12:35 a.m., but did not consider it an emergency that would permit him to enter a female inmate's cell alone. Both Gooch and Buice had observed Slone sitting quietly in the shower area prior to the discovery of the bag. Neither had reason to believe that Slone harm herself with the bag, which was located near the door. While

- 17 -

quicker action would have been preferable, the defendants' failure to respond more promptly does not rise to the level of deliberate indifference.

Further, because the plaintiffs have not shown that Buice or Gooch violated Slone's constitutional rights, Rowland cannot be found to have been deliberately indifferent in a supervisory capacity. *See Leach*, 891 F.2d at 1246. Accordingly, Defendants Buice, Gooch, and Rowland are entitled to qualified immunity with respect to the § 1983 claim.[2]

### 4.        Robert Wilson and Lincoln County

The plaintiff alleges that Jailer Robert Wilson was deliberately indifferent to Slone's risk of suicide because the jail was understaffed and Slone was housed in a defective area. [Record No. 66, 21] But there is no admissible evidence to indicate that Wilson perceived such facts or that he inferred a risk to Slone, or to any inmate. Although Wilmot believed that the jail was understaffed, it is not clear that these concerns were ever discussed with Wilson. [Record Nos. 59, p. 13; 58, p. 19]

More importantly, it is unclear how understaffing allegedly contributed to Slone's suicide. Patton did not testify that the jail was understaffed, nor did she testify that she missed Slone's suicide alert because she was distracted by other duties. Likewise, Wilmot rebuffed the suggestion that Patton missed the alert because she had "too many irons in the fire." [Record No. 59, pp. 17–18] Buice checked on Slone at 1:02 a.m. and again at 1:18 a.m.— more frequently than required under the jail's policy for high-risk inmates.

---

[2] The Court notes that causation must be proved to succeed on a claim of deliberate indifference. *See, e.g., Dabbs v. Bolin*, 21 F.3d 427 (6th Cir.1994). There is no suggestion that Slone used the plastic bag to harm herself, so the defendants would be entitled to summary judgment with respect to any allegations involving failure to remove the bag from Slone's cell.

With respect to the condition of the strip-search cell, there is no evidence that Wilson subjectively perceived any facts indicating that the cell was defective for the purpose of housing suicidal inmates. The record reflects that the cell was routinely used for housing suicidal inmates and that a suicide attempt had never occurred. [Record Nos. 57, p. 27; 58, pp. 37–38] Further, several deputies testified that there had never been any concerns about using the cell for housing suicidal inmates, nor were there discussions of modifying the cell to remove the shower fixtures or enlarge the windows. [Record Nos. 58, pp. 35–37; 59, p. 39; 61, pp. 8–9] Because the plaintiff has not alleged facts to satisfy the subject requirement of deliberate indifference, Wilson is entitled to qualified immunity with respect to the § 1983 claim.

The plaintiff also alleges that Lincoln County is liable under § 1983 because the County had a policy or custom of inadequately training its deputies. [Record No. 66, p. 20] The Lincoln County Fiscal Court, in conjunction with the Jailer, promulgates the official jail Policies and Procedures Manual. [*See* Record No. 54–8; *see also* KRS § 441.045(1).] A municipality may be held liable under § 1983 when it unconstitutionally implements or enforces a policy or custom officially adopted and promulgated by the officers of that municipality. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). But there can be no liability under *Monell* unless there is an underlying constitutional violation. *Baynes v. Cleveland*, 799 F.3d 600, 622 (6th Cir. 2015). With the exception of Defendant Patton, the plaintiff has failed to present facts upon which a reasonable juror could conclude that the individual defendants' conduct constituted deliberate indifference to Slone's serious medical need under the Eighth and Fourteenth Amendments. Accordingly, the Court must focus on Patton's conduct in assessing Lincoln County's potential liability.

- 19 -

With respect to strip-searches, Deputy Jailer Buice testified that the standard procedure at the time in question was the removal of all clothing, with the exception of underwear for females who were menstruating.  [Record Nos. 56, p. 22; 57, p. 46]  Inmates were then searched and required to shake out their hair and open their mouths "to make sure that they don't have anything keestered anywhere."  [Record No. 56, p. 22]  The plaintiff argues that Patton's use of the "squat-and-cough" method demonstrates that she was inadequately trained. The plaintiff notes that Patton had been working at the jail only two months prior to Slone's suicide, but this fact speaks to experience rather than training.  *See Smith v. City of Akron*, 476 F. App'x 67, 70 (6th Cir. 2012).  Patton downplayed her training during her deposition by stating that she received on-the-job training including "how to book and how to dress people and undress them, and that's it."  [Record No. 63, p. 8]  Follow-up questioning revealed that Patton was also required to read the jail's policies and procedures, but she could not recall whether Wilson had asked her any follow-up questions.  *Id.* at pp. 8–9.

The central inquiry is whether the County's alleged failure to train Patton "to adhere to [her] legal duty to honor the constitutional right of inmates to adequate medical care amounted to [the County's] deliberate indifference" to the rights of Slone and other inmates.  *See Shadrick v. Hopkins Cnty., Ky.*, 805 F.3d 724, 738 (6th Cir. 2015).  The plaintiff cannot meet her burden by simply showing that Patton was inadequately trained or that the training program was negligently administered in a particular instance.  *See id.*  Rather, the plaintiff must demonstrate that, as a result of its deliberate conduct, the municipality was the "moving force" behind the injury alleged.  *Bryan Cnty. Bd. of Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). Plaintiffs ordinarily must present proof of prior instances of unconstitutional conduct

demonstrating that the municipality had notice that the training was deficient and likely to cause injury, but ignored it. *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008).

The plaintiff contends that this matter fits into the narrow range of circumstances in which the unconstitutional consequences of failing to train an employee are so patently obvious that the County is liable under a deliberate indifference theory without proof of a pre-existing pattern of violations. *See City of Canton v. Harris*, 489 U.S. at 388–89 (1989); *Connick*, 563 U.S. at 64. In *Canton*, 489 U.S. at 390, the Court posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the streets to capture fleeing felons without first training the officers regarding the constitutional limitations on the use of deadly force. While jail suicides may be prevalent, as the plaintiff contends, the plaintiff has failed to identify a policy or practice of failing to train jail employees with the "patently obvious" consequence that inmates will attempt suicide. Accordingly, Lincoln County is entitled to summary judgment with respect to the plaintiff's claim of deliberate indifference under § 1983.

### C.      State Law Claims

The plaintiff has alleged that the defendants were negligent and grossly negligent in their actions concerning Slone's incarceration and death. [Record No. 29, p. 8] As the plaintiff concedes, Lincoln County is entitled to sovereign immunity and, accordingly, summary judgment will be entered in its favor on the plaintiff's state law claims. *See Edmonson Cnty. v. French*, 394 S.W.3d 410, 414 (Ky. Ct. App. 2013).

In Kentucky, "qualified official immunity" protects public officers and employees sued in their individual capacities for acts performed in the exercise of discretionary functions. *Yanero v. Davis*, 65 S.W.3d 510, 519 (Ky. 2001). Discretionary acts are those activities which

- 21 -

involve the exercise of judgment and personal deliberation.  *Id.*  Qualified official immunity affords such officials protection from damages liability for good faith judgment calls made in a legally uncertain environment.  *Id.* at 521–22.  Qualified official immunity does not apply to acts performed in the exercise of ministerial functions, however.  *Id.*  Ministerial acts are those activities that require only obedience to the orders of others or duties that are absolute, certain, or involve the execution of specific acts.  *Jenkins Ind. Sch. v. Doe*, 379 S.W.3d 808, 812 (Ky. Ct. App. 2012).

It is necessary to examine the acts complained of and classify them as discretionary or ministerial in determining whether the defendants are entitled to qualified official immunity.

### 1.      Robert Wilson

The plaintiff alleges that Defendant Wilson was negligent or grossly negligent with respect to the employment, training, and supervision of the deputy jailers, and as to the promulgation of the jail's operating policies and procedures.  [Record No. 29, p. 3]  The hiring process has a ministerial aspect in that the person to whom hiring is entrusted "must at least attempt to hire someone who is not incompetent."  *Yanero*, 65 S.W.3d at 528.  On the other hand, hiring is inherently subjective, as the hiring party must evaluate the credentials of the prospective employee.  *Id*.  Although decisions on the content of policies and training is a discretionary function, the training of employees to adhere to those policies once they have been decided is a ministerial function.  *Finn v. Warren Cnty., Ky.*, 768 F.3d 441, 449 (6th Cir. 2014).

Accordingly, Wilson is entitled to qualified official immunity on the plaintiff's state law claims with respect to the promulgation of the jail's policies and procedures.  Wilson is not entitled to immunity regarding hiring decisions because the defendants have failed to

identify any evidence concerning Wilson's decision to hire Patton, or any of the other defendants.   Further, because training is a ministerial function, Wilson is not entitled to immunity on these claims.

Negligence requires proof of: (1) a duty owed by the defendant to the plaintiff; (2) breach of the duty; (3) injury to the plaintiff and (4) legal causation between the defendant's breach and the plaintiff's injury.   *Wright v. House of Imports, Inc.*, 381 S.W.3d 209, 213 (Ky. 2012).   Generally, each person owes a duty to every other person to exercise ordinary care to prevent foreseeable injury.   *Isaacs v. Smith*, 5 S.W.3d 500, 502 (Ky. 1999).   Based on the "special relationship" between jailer and inmate, Wilson had a duty to protect Slone from foreseeable harm.   *See Fryman v. Harrison*, 896 S.W.2d 908, 909–10 (1995).

The defendants suggest that an expert opinion is required to establish the applicable standard of care in this case.   [Record No. 54–1, p. 30]   However, they rely on a medical negligence case to support that proposition.   *Id.* at p. 31 (citing *Green v. Owensboro Health Sys., Inc.*, 231 S.W.3d 781, 783–84 (Ky. Ct. App. 2007)).   In cases involving professions requiring special skill and expertise, the standard of care is usually measured by the conduct customary in the profession under the circumstances. *See Hyman & Armstrong, P.S.C. v. Gunderson*, 279 S.W.3d 93, 113 (Ky. 2008).   However, expert testimony is not required in cases where issues are within the common knowledge of lay persons or when the alleged negligence of a professional is so apparent that even a lay person could recognize it.   *Baptist Healthcare Sys., Inc. v. Miller*, 177 S.W.3d 676, 681 (Ky. 2005).   The issues involved in this case are within the understanding of everyday citizens, and expert testimony is not required to establish the standard of care.

The plaintiff has failed to offer a substantive argument in response to the defendants' motion for summary judgment on the negligent hiring claims.  [*See* Record No. 66, pp. 22–23.]  Instead, she simply argues that there are "at least genuine issues of material fact" with respect to her claims of negligence, gross negligence, and wrongful death.  *Id.* at p. 22.  Under Kentucky law, the elements of negligent hiring are: "(1) the employer knew or reasonably should have known that an employee was unfit for the job for which she was employed; and (2) the employee's placement or retention at the job created an unreasonable risk of harm to the plaintiff."  *Ten Broeck Dupont v. Brooks*, 283 S.W.3d 705, 733 (Ky. 2009).  The plaintiff has failed to produce evidence regarding these elements, or to even argue that they are satisfied.  The Court notes that the deputy jailers' deposition testimony that they did not have previous experience in law enforcement is not by itself sufficient evidence to demonstrate that they were unfit for their positions.  Accordingly, summary judgment will be granted in favor of Wilson on the plaintiff's claims of negligent and grossly negligent hiring.

Title 501 of the Kentucky Administrative Regulations, section 3:160, sets out many requirements regarding the number of hours and content for the training of jail staff.  The plaintiff does not allege that Wilson violated any of these requirements.  Instead, she claims that he violated his general duty to prevent foreseeable harm to Slone when it came to training the deputy jailers.  Based on the record, this is what is known about Wilson's training of the deputy jailers:  (i) Deputies Wilmot and Patton were trained on the job and were required to read the Jail Policies and Procedures Manual [Record Nos. 63, p. 9; 59, pp. 48–49]; (ii) Deputy Wilmot recalled that Wilson quizzed him regarding the Policies and Procedures, but Patton could not remember whether Wilson had done so.  *Id.*; and (iii) Deputy Rowland testified that

the jail staff received supplemental, off-site training in suicide prevention in early 2015. [Record No. 58, p. 21]

To withstand a properly-supported motion for summary judgment, the plaintiff must do more than rely on the allegations of her complaint or identify a "metaphysical doubt" or "hypothetical plausibility" based on a lack of evidence. *Chappell v. City of Cleveland*, 585 F.3d 901, 912 (6th Cir. 2009). Rather, she must come forward with specific facts based on the discovery on file showing that there is a genuine issue of material fact for trial. *Id.* (citing Fed. R. Civ. P. 56(c)). Here, the plaintiff has failed to carry this burden by adducing evidence regarding Wilson's alleged failure to train the deputy jailers. It appears that the plaintiff deposed all of the deputy jailers involved in Slone's incarceration, but questioned them very minimally regarding their training, if at all.

The plaintiffs have not identified sufficient evidence which indicates that any deputy's alleged shortcoming was due to Wilson's failure to train. And Wilson cannot be held vicariously liable for the acts of the deputy jailers in which he was not directly involved. *See Franklin Cnty., Ky. v. Malone*, 957 S.W.2d 195, 199 (Ky. 1997) (rev'd on other grounds by *Yanero*, 65 S.W.3d 510 (2001). Therefore, summary judgment will be granted in Wilson's favor regarding this claim.

### 2.    Renata Patton

Patton is not entitled to qualified immunity for the ministerial acts regarding: the booking process, strip search, and search of Slone's cell. *See e.g., T.S. v. Doe*, 742 F.3d 632, 641 (6th Cir. 2014). While these actions may have had some component of "personal deliberation, decision, or judgment," they more clearly align with carrying out a duty which is absolute, certain, and involves the execution of a specific task. *See Haney v. Monsky*, 311

- 25 -

S.W.3d 235, 240 (Ky. 2010) ("In reality, few acts are ever purely discretionary or purely ministerial.").  The defendants have provided no argument that the booking process required Patton to use judgment or adjust to an unpredictable scenario.  *See Hedgepath v. Pelphrey*, 520 F. App'x 385, 390 (6th Cir. 2013).  Similarly, when searching Slone and clearing out her cell, it appears that Patton was following jail policy or Deputy Wilmot's orders.

The plaintiffs have produced evidence from which a jury could conclude that Patton knew or should have known that Slone was at risk for suicide and that she failed to contact mental health triage, an official policy of which Patton was aware.  The jury could also conclude that Patton's searches of Slone and her cell were performed negligently and, as a result, Patton was able to retain contraband, given to her by Patton, which she used to hang herself.  Based on these possible conclusions, a jury could reasonably find that Patton breached her duty to protect Slone from foreseeable harm, *see Fryman*, 896 S.W.2d at 909–10.  It is also possible that a reasonable jury could conclude that she did so with "a wanton or reckless disregard" for Slone's safety.  *See Horton v. Union Light, Heat & Power Co.*, 690 S.W.2d 382, 387–88 (Ky. 1985) (describing culpability requirement for gross negligence).  *See also City of Middlesboro v. Brown*, 63 S.W.3d 179, 181 (Ky. 2001).  Accordingly, the defendant's motion for summary judgment will be denied with respect to Patton.

### 3.   Bryan Wilmot, Chrisana Buice, Jeffery Gooch, and Brenda Rowland

The defendants have failed to identify any challenged actions performed by these deputy jailers that would entitle them to qualified official immunity.  On March 10, 2017, the defendants filed *Peterson v. Dunbar*, No. 2015-CA-513, 2016 WL 7321433 (Ky. Ct. App. Dec. 16, 2016), as supplemental authority.  However, it is unclear how this case helps the defendants' position.  In *Peterson*, the court stated that the jailer's and deputies' duty to classify

- 26 -

prisoners under 501 KAR § 3:110 is discretionary; therefore, the officials were entitled to qualified official immunity.  *Id.* at *6.  In the present case, the plaintiffs do not challenge the defendants' decision to classify Slone as high-risk.  Rather, the plaintiffs challenge the defendants' booking, search, and supervision of Slone which, as discussed in *Peterson*, are ministerial acts.  *See id.*

The plaintiff has not identified a genuine issue of material fact indicating that Defendant Wilmot breached his duty to prevent foreseeable harm to Slone.  Rather than identifying specific evidence connecting Wilmot to Slone's suicide, the plaintiff makes vague references to Wilmot's "failure to direct and supervise."  [Record No. 66, pp. 12, 22–23]  The record indicates, however, that Wilmot reasonably relied on Patton to perform Slone's booking according to her training.  To Wilmot's knowledge, Patton had never "missed" a Jail Tracker alert.  Further, Wilmot took reasonable measures to prevent mistakes.  He had a practice of reviewing the other deputy jailers' work, which allowed him to identify Slone's suicide alert.  The plaintiff concedes that, upon identifying the alert, Wilmot took appropriate steps by contacting jail triage and directing Patton to invoke high-risk precautions.

The plaintiff's suggestion that Wilmot should have engaged in a higher level of supervision is not supported.  Although Patton had missed the alert, Wilmot had no reason to believe that Patton was incapable of adequately performing a strip-search or clearing a cell, as she had been trained these procedures.  The record indicates Wilmot would not have been able to physically enter the strip-search cell to observe Slone while she cleared the premises.  Pursuant to Kentucky Administrative Regulations and Jail Policy, Wilmot could not supervise Patton's strip-search of a female inmate.  *See* 501 KAR § 3:120.  Because the plaintiff has

failed to identify specific evidence suggesting that Wilmot breached his duty to Slone, summary judgment on the plaintiff's state law claims asserted against him will be granted.

Summary judgment will also be granted in favor of Defendants Buice and Gooch on these claims. At one point, the defendants deviated by 12 minutes from the required 20-minutes checks Slone was to receive under her triage plan and as required by 501 KAR § 3:060. (Slone was checked at 12:03 a.m. on May 16, 2015, and again at 12:35 a.m.) While the failure to observe Slone every 20 minutes may constitute a deviation from the applicable standard of care, Gooch and Buice began checking on Slone more frequently after that. Slone was observed three times between 12:48 a.m. and 1:18 a.m. when, unfortunately, she was found unresponsive. The deputies' single deviation from the 20-minute check schedule, removed in time from Slone's death, was not a substantial factor in causing Sloan's suicide. *See Deutsch v. Shein*, 597 S.W.2d 141, 143–44 (1980). *See also Anestis v. United States*, 52 F. Supp. 3d 854, 863–64 (E.D. Ky. 2014).

Additionally, Buice and Gooch only had a duty to protect Slone from *foreseeable* harm. *See, e.g., Williams v. Ky. Dep't of Educ.*, 113 S.W.3d 145, 148 (2003). They were not present during Slone's booking and there is no evidence to suggest that they had reason to suspect that Slone possessed contraband with which she might harm herself. Finally, Buice and Gooch were not negligent or reckless for failing to remove a plastic bag from Slone's cell because there is no suggestion that she was harmed by the presence of a plastic bag. *See Deutsch*, 597 S.W.2d at 143–44.

Defendant Rowland did not have direct contact with Slone. Instead, the plaintiff's allegations against Rowland are based on her supervision of Defendants Buice and Gooch. [Record No. 66, p. 19] An employer may be held liable for negligent supervision only if she

knew or had reason to know of the risk that the employment created.  *Carberry v. Golden Hawk Transp. Co.*, 402 S.W.3d 556, 564 (Ky. Ct. App. 2013).  Because the deputies reported all cell checks to the shift-supervisor, Rowland was aware that Buice did not strictly adhere to the 20-minute check schedule.  [Record No. 58, p. 11]  Rowland also knew that Slone had been placed on high-risk classification and that she had a history of attempting suicide.  *Id.* at p. 25.  However, like the other defendants who reported for duty at midnight, she had no reason to suspect that Slone had an increased likelihood of possessing contraband.  Further, Rowland reasonably relied on Buice and Gooch each time they radioed to report that Slone was "ok." [*See* Record No. 58–1, pp. 12–27.]

Additionally, to prevail on a negligent supervision claim, the plaintiff must show that her harm was caused by the defendant's negligent supervision of employees.  *See Hugenberg v. West Am. Ins. Co.*, 249 S.W.3d 174, 181 (Ky. Ct. App. 2006).  For the reasons explained above, the plaintiff cannot establish that Buice's or Gooch's actions were a substantial factor in bringing about Slone's suicide.  Accordingly, Rowland's supervision of Buice and Gooch is not a substantial factor, either.  As a result, summary judgment will be granted in favor of Rowland on the plaintiff's state-law claims.

## IV.   CONCLUSION

For the reasons discussed above, it is hereby

**ORDERED** as follows:

1.      The defendants' motion for summary judgment [Record No. 54] is **GRANTED**, in part, and **DENIED**, in part.

2.      Summary judgment is **GRANTED** in favor of Defendants Lincoln County, Robert Wilson, Brenda Rowland, Jeffery Gooch, Chrisana Buice, and Bryan Wilmot.

   3.    Summary judgment is **DENIED** with respect to the Plaintiff's claims against

Defendant Renata Patton.

   This 16th day of March, 2017.

Signed By:

*Danny C. Reeves*   DCR

**United States District Judge**